Filed 7/7/21  P. v. Carter CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B305863 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. PA054745 |
| v. | |
| KIMBERLY CARTER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael Terrell, Judge. Reversed and remanded with directions.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

In 2008, defendant Kimberly Carter pled no contest to voluntary manslaughter and was sentenced to 27 years in prison. In 2020, the Secretary of the Department of Corrections and Rehabilitation (CDCR) asked the trial court to recall and reduce Carter's sentence because her conduct in prison had been exemplary. During her 12 years of confinement, Carter had never violated prison rules. To the contrary, she had participated in a variety of educational, occupational, and self-help programs; earned her GED and started college; and received several commendations, including for coming to the aid of a correctional officer during a medical emergency. After the court summarily rejected the Secretary's recommendation, Carter's attorney requested a hearing and the opportunity to present additional information relevant to the court's decision. The court denied both requests, and Carter appeals. We conclude that the court abused its discretion by declining Carter's request to submit additional evidence. We therefore reverse and remand for further proceedings.

# BACKGROUND

## 1. Underlying Facts and Sentencing

In his letter to the trial court, the CDCR Secretary described the underlying facts of this case as follows:

"On March 7, 2006, Carter's mother returned home and found the victim lying on the floor of the master bedroom, motionless and unresponsive. The victim appeared dead and Carter was not in the area, which prompted Carter's mother to call the police. Carter's mother informed police that [Carter told her] to not come home the night before because [Carter] wanted

some alone time to work out some personal problems with the victim. While her mother was talking to officers, Carter's sister called their brother and was told that he had spoken with Carter, who admitted she knew of the death because she 'did it' and was going to kill herself.

"On March 9, 2006, an investigating officer received a call from KNBC News and informed them that Carter wanted to turn herself in to the station in front of the camera. Officers escorted the news crew to a hotel, where Carter met with a reporter. Carter was taken into custody without incident. It was determined the victim died of a single gunshot wound to the chest."

By second amended information dated July 28, 2008, Carter was charged with one count of murder (Pen. Code,[1] § 187, subd. (a); count 1) and one count of criminal threats (§ 422; count 2). As to count 1, the information alleged Carter personally used a handgun, personally discharged a handgun, and personally discharged a handgun causing death. (§ 12022.53, subds. (b)–(d).) The information also alleged Carter had been convicted of bank robbery in 2002, and that the conviction constituted both a strike prior (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a serious-felony prior (§ 667, subd. (a)(1)).

On August 4, 2008, the information was amended by interlineation, and Carter pled no contest to one count of voluntary manslaughter (§ 192, subd. (a); count 3) and admitted the use of a firearm (§ 12022.5, subd. (a)) and her prior conviction. The court sentenced Carter to an aggregate term of 27 years in state prison: the mid-term of six years, doubled for the

---

[1] All undesignated statutory references are to the Penal Code.

prior strike, plus 10 years for the firearm enhancement and five years for the serious-felony prior. The remaining counts and allegations were dismissed. Carter was later ordered to pay $9,767.20 in victim restitution.

## 2. The Secretary's Recommendation to Recall Carter's Sentence and Resentence Her

On January 9, 2020, the CDCR Secretary sent a letter to the trial court. After describing the letter's purpose as "provid[ing] the court with the authority to resentence [Carter] pursuant to Penal Code section 1170, subdivision (d)(1)," the Secretary explained: "As Secretary of CDCR, I take my obligation to public safety very seriously and choose only to make exceptional conduct referrals when an inmate's behavior, while incarcerated, demonstrates a sustained compliance with departmental rules, regulations and requirements as well as prolonged participation in rehabilitative programming. These inmates have not only exhibited exceptional conduct through their ability to obey rules and regulations, but have also demonstrated a commitment to their rehabilitation through voluntary participation in self-help programs."

Carter, the letter continued, "is commended for remaining disciplinary free since her arrival to CDCR on August 12, 2008. Carter is currently assigned to the California Prison Industry Authority Career Technical Education—Computer Coding. Inmate Carter also participates in voluntary e-learning, College (onsite and correspondence) and The Urban Ministry Institute. Carter has taken advantage of various self-help and self-awareness group programs available to her and has attained a Choice Theory and Addiction Coaching certification. She has also received four Laudatory Chronos, from staff and self-help

4

sponsors, including assisting a Correctional Officer during a medical emergency. Inmate Carter met the standards of the General Educational Development (GED) and received her High School Equivalency Certificate at the California Institution for Women." Accordingly, the Secretary recommended "the inmate's sentence be recalled and [s]he be resentenced."

The Secretary included five pages of additional information, including three single-spaced pages detailing Carter's many educational, vocational, and mental health achievements during her incarceration—starting the moment she arrived in prison. The letter also noted that Carter had 17 relatives and associates, of whom 15 were approved for visits.

### 3. The Trial Court's Ruling on the Secretary's Recommendation

In a minute order dated February 28, 2020, the court[2] responded to the Secretary's letter: "The court is in receipt of a letter dated January 9, 2020 from the Office of the Secretary of the Department of Corrections [and Rehabilitation]. The correspondence states that inmate Carter received a Penal Code section 12022.5(a) and a Penal Code section 667(a) sentence enhancement attached to her Penal Code section 192(a) offense, resulting in a total sentence of 27 years in state prison. The correspondence further states that the court may want to re-consider the sentence pursuant to Penal Code section 1170(d), especially in light of inmate Carter's stellar record while incarcerated. The court has reviewed defendant's file and

---

[2] Although the Secretary sent the letter to the judge who had taken the plea and sentenced defendant in 2008, that judge had since retired, and the matter was assigned to a different bench officer.

concluded that defendant's sentence will not be modified. The court thanks the Department of Corrections [and Rehabilitation] for its input."

Early the next week, at defense counsel's request, the court placed the matter on calendar to create a more complete record. At the proceeding, the court explained its view that CDCR's letter did not trigger the right to a hearing, the right to resentencing, or "any sort of obligation by the court to get input from counsel." Instead, the court's view was that the "only obligation the court has when one of these letters comes in is to carefully review the file and determine whether a resentencing is appropriate." To do that, the court's practice was to "go back and look at the facts of the case [and] determine whether the sentencing was somehow outside the normal bounds of what should have occurred."

The court noted that the victim had suffered more than one gunshot wound and that Carter had hidden the firearm, then fled the scene. Carter subsequently confessed to her brother and surrendered to the news media rather than to the police. The court summarized its view that "27 years for this kind of crime is not outside the range of normal standards. Certainly, the mid-term for the base offense is not outside any sort of thing that's— that typically would be done."

Although the law had changed since 2008 to allow the court the discretion to strike the section 12022.5 enhancement, the court explained that "even with the change of law, all that does is give the court discretion not to impose it; it doesn't make the imposition of it illegal. And here, because a firearm was shot more than one time, because it was hidden, I think that is appropriate to include that firearm enhancement." Finally, "the last five years [of Carter's sentence] was for the prior, so overall,

[the court] did not view this case as a case in which a resentencing was appropriate even given Ms. Carter's stellar record while she's been incarcerated."

After again emphasizing that it was not holding a hearing, the court gave defense counsel an opportunity to make a record for appellate review. Defense counsel made two requests. She asked the court to allow her to submit a brief on the issue of whether Carter was entitled to a hearing, and she asked the court to allow her to provide additional context that might change the court's mind about recalling Carter's sentence.

Defense counsel, who had represented Carter in 2008, explained that "the reason there was the ability to have a plea agreement to the voluntary manslaughter at that time based on some of the facts the court recited is because of some of the supplemental information that [counsel had] provided to the District Attorney's Office at that time.

"Had this case gone to trial, [counsel] expected to call witnesses and to present evidence that [Carter] was a victim of domestic violence at the hands of the victim in this case—alleged victim—and that, in fact, [Carter] was a victim of sexual assault the day of the shooting. And so this is evidence [counsel had] presented to the prosecutor, which allowed for the offering of a determinat[e] sentence in this case."

Counsel acknowledged that Carter surrendered to a television station rather than to the police, but explained that Carter was "an African-American woman, who, at the time, stated her reason for surrendering to a T.V. station was because she was afraid of being harmed by the police during the surrender."

Notwithstanding these mitigating circumstances, Carter had shown remorse. She had used all of her prison earnings and gifts from her family to pay off the $9,767 in victim restitution awarded in the case. Despite "the very troubled relationship she had with the victim in this case," it was important to Carter "to make amends in that way … ."

But Carter's self-reflection and accountability were only parts of a much larger rehabilitative effort. So, in addition to placing the facts of Carter's underlying offense in context, counsel emphasized that "since [Carter's] entry into the prison, she's not had a single disciplinary write-up. And not only that, she has [also] done every amount of programming that she possibly could have done given her sentence and the institution she's in." Indeed, the reason Carter was "asking for the court's mercy on" the serious-felony prior—which had also been used to double her sentence under the Three Strikes law—was that the enhancement foreclosed "the ability to do further programming— enhanced programming—in the institution where she currently resides."

In short, counsel explained that "in this case, we have somebody who is doing her level best to rehabilitate herself while within the confines of the state prison. She's doing it. She's proving it. She's still able to be connected to her family, and there are literally classes, educational and self-improvement classes— particularly as a woman with a trauma history—that she cannot take advantage of while in state prison with the [section] 667(a) prior still as part of her sentence."

Counsel sought the opportunity to present the court with evidence supporting her representations. In response, the prosecutor said only that he agreed with the court that

section 1170, subdivision (d)(1) did not require the court to hold a hearing and he "would submit with the court's earlier statements."

The court concluded: "As I said before, I'm not even sure that the defendant is entitled to this proceeding this morning. I did it out of respect for [defense counsel], and we have a record. I have let everyone make their record. The court is confident or comfortable with its determination and its conclusion that no further hearing is necessary, so that's the ruling of the court, but there is a record now if [defense counsel] wishes to proceed with it."

Carter filed a timely notice of appeal.

## DISCUSSION

Carter contends the court abused its discretion by rejecting her request to provide it with additional information relevant to the Secretary's recommendation to recall her sentence. We agree.

### 1.    Legal Principles and Standard of Review

" 'Section 1170(d) is an exception to the common law rule that the court loses resentencing jurisdiction once execution of sentence has begun.' [Citations.]" (*People v. McCallum* (2020) 55 Cal.App.5th 202, 210 (*McCallum*).) The statute provides in relevant part: "When a defendant … has been sentenced to be imprisoned in the state prison … the court may … at any time upon the recommendation of the [S]ecretary or the Board of Parole Hearings in the case of state prison inmates … recall the sentence and commitment previously ordered and resentence the defendant in the same matter as if they had not previously been sentenced, provided the new sentence, if any, is no greater than the initial sentence." (§ 1170, subd. (d)(1).)

9

Administrative regulations, in turn, set out the circumstances under which the secretary may exercise his or her discretion to recommend that the court recall an inmate's sentence. (Cal. Code Regs., tit. 15, § 3076.1.) One such circumstance is when there is a change in the sentencing law. (*Id*., § 3076.1(a)(3).) But despite this authority—and indeed, since Carter's sentencing, 15 years' worth of formerly-mandatory sentence enhancements in her case have become discretionary— that was not the basis for the recommendation here. Instead, the Secretary recommended recall and resentencing based on Carter's "exceptional conduct" while incarcerated. (*Id*., § 3076.1(a)(1).)

"An inmate may be considered for referral" for "exceptional conduct" "if their behavior while incarcerated demonstrates sustained compliance with departmental regulations, rules, and requirements, as well as prolonged participation in rehabilitative programming." (Cal. Code Regs., tit. 15, § 3076.1(b)(1).) Inmates are not eligible until they have "served 10 continuous years or 50% of their current commitment, whichever comes first." (*Id*., § 3076.1(b)(2)(B).) The Secretary must elect whether to recommend an inmate for recall and resentencing by exercising his or her "broad discretion" and, if so recommending, must forward a recommendation letter and cumulative case summary to the sentencing court and provide a copy to the inmate. (*Id*., §§ 3076.1(e)(2), 3076.1(e)(4).)

"In deciding whether to recall a sentence under section 1170, subdivision (d)(1), the trial court may exercise its authority 'for any reason rationally related to lawful sentencing.' [Citation.]" (*McCallum*, *supra*, 55 Cal.App.5th at p. 210.) The statute instructs the court, when resentencing a defendant, to

10

"apply the sentencing rules of the Judicial Council so as to eliminate disparity of sentences and to promote uniformity of sentencing. The court resentencing under this paragraph may reduce a defendant's term of imprisonment and modify the judgment, including a judgment entered after a plea agreement, if it is in the interest of justice." (§ 1170, subd. (d)(1).) That is, the court must reevaluate the previously-imposed sentence to ensure it is still just.

The statute encourages the court to look at justice holistically by emphasizing that in this context, a sentence should reflect not just the criminal behavior that sent the inmate to prison but also how she has spent her time since she arrived. Thus, it authorizes the court in resentencing a defendant to consider "postconviction factors, including, but not limited to, the inmate's disciplinary record and record of rehabilitation while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the inmate's risk for future violence, and evidence that reflects that circumstances have changed since the inmate's original sentencing so that the inmate's continued incarceration is no longer in the interest of justice." (§ 1170, subd. (d)(1).)

We review the trial court's decision whether to recall an inmate's sentence under section 1170, subdivision (d)(1), for abuse of discretion. (*McCallum*, *supra*, 55 Cal.App.5th at p. 211.)

## 2. The court abused its discretion by denying defendant's request to present evidence in support of the Secretary's recommendation.

Defendant argues the court abused its discretion by denying defense counsel's request to present additional information relevant to its decision. We agree.[3]

In *McCallum*, our colleagues in Division 7 held that although the statutory language of section 1170, subdivision (d), does not "require a trial court to hold a hearing before acting on a recommendation by the [S]ecretary for recall and resentencing," "in light of [the] substantial right to liberty implicated by the [S]ecretary's recommendation to recall [the defendant's] sentence [citation], the trial court abused its discretion in denying [him] an opportunity to present information relevant to the Secretary's recommendation." (*McCallum, supra*, 55 Cal.App.5th at p. 206.) Here, as in *McCallum*, the CDCR Secretary recommended that the trial court exercise its discretion to recall the defendant's sentence. Here, as in *McCallum*, the defendant sought to present information relevant to that choice. And here, as in *McCallum*, the court denied the defendant's request and rejected the Secretary's recommendation. On these facts, *McCallum* held that

---

[3] To the extent Carter is requesting a hearing in addition to the ability to submit additional information, we deny the request. (See *McCallum, supra*, 55 Cal.App.5th at pp. 211–216.) And to the extent Carter invites us to disagree with *McCallum* and *People v. Frazier* (2020) 55 Cal.App.5th 858 or to reach her constitutional argument, we decline the invitation. (See *California State Electronics Assn. v. Zeos Internat. Ltd.* (1996) 41 Cal.App.4th 1270, 1274 [courts should avoid constitutional questions where other grounds are available to dispose of the case].)

12

the trial court abused its discretion. Accordingly, like our colleagues did in *McCallum*, we will reverse and remand to allow the defendant and the prosecution "an opportunity to present additional information relevant to the [S]ecretary's recommendation, and for the trial court in light of this information and any briefing provided by the parties to exercise its discretion whether to recall [the defendant's] sentence." (*Id.* at p. 207.)

In the two paragraphs they devote to the issue, the People do not argue that *McCallum* was wrong on this point. Instead, they maintain that *McCallum* does not apply to this case because its "procedural posture … is materially distinguishable from that here." The People's material distinction is that in *McCallum*, defense counsel requested a case management conference *before* the court summarily rejected the Secretary's recommendation whereas in this case, defense counsel asked to submit further information two court days *after* the court summarily rejected the Secretary's recommendation. Thus, the People insist, defendant's request was untimely. The People are mistaken.

To the extent *McCallum* addresses timeliness at all, it is to note its irrelevance. On June 4, 2019, McCallum's attorney lodged in the trial court a notice of appearance and separate motion for a case management conference. (*McCallum*, *supra*, 55 Cal.App.5th at p. 209.) Although it's unclear whether those documents were ever actually filed—and if so, when—they were both marked "received" on July 8, 2019.[4] (*Id.* at p. 209, fn. 4.) In a minute order issued the same day—the opinion does not reveal

---

[4] The opinion does not reveal the basis for its conclusion that these documents were lodged over a month before they were received.

13

whether it was before or after the documents were received—the court declined the Secretary's recommendation. (*Id.* at p. 209.) Further complicating matters, and notwithstanding the court's service of the order on defense counsel, the minute order noted that the defendant was not present in court and was not represented by counsel. (*Ibid.*)

Presumably, if our colleagues in Division 7 had been concerned about the temporal relationship between the court's minute order and the defendant's request to submit additional information, it would have addressed this issue. Instead, the court demonstrated the timing's irrelevance by observing in a footnote: "whether the trial court at the time of its denial of the Secretary's recommendation believed McCallum was represented by counsel does not affect our analysis." (*McCallum, supra,* 55 Cal.App.5th at p. 209, fn. 5.) That statement is important because the notice of appearance and the motion for a case management conference were lodged on the same day—so if it doesn't matter when the trial court learned the defendant had a lawyer (the notice of appearance), it *also* doesn't matter when the defendant sought the opportunity to submit additional evidence (the motion).

Ultimately, despite the People's efforts to obscure its holding and insert caveats where none exist, *McCallum* could not be clearer: "Once [the defendant] requested an opportunity to respond to the [S]ecretary's recommendation by requesting a case management conference and possible briefing and presentation of evidence, the trial court's decision simply to ignore [the defendant's] request to provide input on the Secretary's recommendation was an abuse of discretion." (*McCallum, supra,* 55 Cal.App.5th at p. 216, fn. omitted.) And again: "[U]pon a

14

request by [the defendant], the trial court was required to consider evidence in support of the Secretary's recommendation." (*Id*. at p. 217.)

In short, there is only one meaningful difference between this case and *McCallum*: Here, defense counsel painted a detailed picture of the evidence she would offer if given the chance; in *McCallum*, the court was forced to speculate about what that evidence might show. (*McCallum*, *supra*, 55 Cal.App.5th at pp. 207, 217–218.) But either way, the court abused its discretion.

## DISPOSITION

The trial court's order declining to recall Carter's sentence is reversed. The matter is remanded to allow the parties to submit information relevant to the circumstances of the crime and the Secretary's recommendation and to provide briefing on whether the court should follow the Secretary's recommendation. Upon receipt of this information, the court is to exercise its discretion whether to recall and resentence Carter. We express no opinion about how the court should exercise that discretion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

KALRA, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.